Good morning, Your Honors. May it please the Court. I'm Nicholas Thompson from Casey Jones Law. I represent Michael Coffey, a former employee for Norfolk Southern Railroad Company, a longtime and loyal employee who took medical leave for a ruptured Achilles tendon. No one disputes that when he returned from that leave, Norfolk Southern had a right to request medical records regarding his Achilles tendon to show whether he could safely do his job. But that's not what happened. Norfolk Southern asked him for way more than that, and then they fired him when he didn't produce each and every record it requested. The only question here is whether Norfolk Southern had carte blanche to demand Coffey's medical records beyond that Achilles tendon. The district court treated that question as binary. Either yes, Norfolk Southern had the requisite cause to request medical records on a given condition, in which case it had carte blanche to request every medical record on that condition. Are you going to argue with respect to the prescriptions or have you abandoned that argument? So I'm not sure I fully understand. I thought that part of your case was that the company asked for too many or too often the records with regard to the prescriptions. It's too much in the way they went about it, Judge. But are you still arguing that? Because what you're talking to us now is about the leg injury. Yes, they're intertwined. And so the tendonitis or the ruptured tendonitis came after the series of... So I would have thought if you were going to talk about the other ones, you'd talk about them first. I mean, like a chronological order. Sure. The way this happened procedurally is Michael Coffey ruptures a tendon, goes out on medically. When he comes back, they ask him for the tendon records and the prescriptions, which they'd asked him for previously. And he testified he'd given them previously to them. He'd remained in service. And so the first time he's withheld from service because of a medical record request is after the tendon issue. And that's why I approached it that way. But I think it does make sense to talk about the prescriptions, probably at the outset, because what Norfolk Southern is representing, of course, isn't true. It says federal regulations, federal regulations, federal regulations. They required us to ask us this information. That is not what the regulation requires. What the regulation does is prohibit railroad employees from taking prescription medications, except under certain circumstances. Namely, when the railroad is deemed it's safe. And the way you do that, according to the only expert in this case, is you start by talking with the employee. The medical director calls the employee, which did not happen in this case, and says, why are you taking this prescription? And then if what the employee says doesn't... Can I, because I, what you just said reminds me of a question I have about your case. And I'm not, is your argument on the request for this information that the railway was not entitled to the information? Or is your claim that, well, they were entitled to it, but not to get it the way they went about it. They were required to do things like first talk to the employee, then maybe talk to the doctors directly. Is it that they weren't entitled to the information or that they had to use a different way to get it? It's both. And the reason why it's both is this. The railroad was entitled to some information on each of the three conditions. But once they got, for example, the prescription, it's undisputed that Mr. Coffey turned over his prescriptions for both the pain medication... Turned over all the information that the railway requested. That's right. And so the railroad was entitled to some information, namely enough to know that he was safe to do his job. That does not open, you know, carte blanche to request every record on that condition. And it's especially imperative the way they went about it in this case. But I don't understand, how does just having the fact of this prescription, how is that enough to know to answer sort of legitimate questions about safety? You have to know how much is being used, whether it's being used consistent with the doctor's orders, how the two medications are interacting. I mean, just having two prescriptions doesn't answer all the questions. And that's why you talk to the employee. So you're saying at that point, they have to stop asking for records, and the only thing they can do is sort of a different kind of follow-up. There has to really, at the outset, there should be an interactive dialogue. Can you talk just a little louder? I can. Sorry. Where is the requirement in the law for an interactive dialogue? I just don't understand what the legal hook is. Look, I understand on the facts of this case, it looks like there might have been more efficient ways to go about getting this information. But I'm having trouble finding that requirement anywhere in this legal provision. I don't see anything about sort of methods of gathering information. Sure. It's fact meets law. So the law is the railroad has to have, for each record request, an objectively reasonable belief that that medical condition prevents the employee from safely performing his or her job. And the only expert testimony in this case has been the way you get that, you talk to the employee. And so in some cases, what Norfolk Southern did may be reasonable. But you don't know until you talk to the employee. And I personally don't see that in the law. I think the government, the railroad has an opportunity, I mean, an obligation to be sure that things are safe. And there's nothing that says they have to do that by talking to the employee. What they do— What they are complying with. What it does require is a reasonable analysis. Right. And in certain circumstances— You're saying that an expert can tell, can judge what a reasonable analysis is better than we can. Sure. When it's a medical expert, absolutely. And experts do this all the time in tort cases. But this isn't that. No, this is— This is whether you have complied, whether the railroad has complied with the regulation, whether its inquiries were consistent and necessary under the regulation. And part of that— And to tell me, they may have been burdensome. He may say that he kept giving the records. But it's undisputed that the railroad didn't get the records. Some of the records didn't even exist. That's the problem. When you go about it— Let me ask you this, counsel. The legal question here, the legal standard here is not in dispute, is it? Because the request for records might be job-related and consistent with business necessity. Now, that's the legal standard, is it not? That is, Judge. And we all agree that that's the legal standard, right? We do. Okay. Then why isn't this request for information akin to a discovery dispute over which we normally let district courts sort that out? We have requests for documents and requests for depositions, but requests for documentary evidence is a part of discovery all the time. And if the legal standard is not in dispute, and it's not, why shouldn't the implementation of that legal standard be left as discovery matters are to district judges unless they— I was going to say run off the rails, but I don't want to use that phrase— unless they run awry. This isn't a case procedural right. This is a federally granted right to employees, basically a right to privacy. Congress was concerned that employers would invade employees' privacy and would discriminate against disabled employees based on their records. And so it limits when an employer can get records. No one disputes here that Norfolk Southern had a right to some records. But counsel, what it's been when you look at the record, getting this information has been like pulling teeth. And as Judge Harris has pointed out, and as the regulations make clear, there are certain things that the railroad has to do to satisfy itself on basic public safety. And you have to know not just what medications are taking place, but you have to know what the dosage is. You have to know the frequency of use. You have to know the side effects. You have to know the interactions between drugs because it's too important to be left to chance. And the problem here is if you have a major railway accident, because drugs have impaired someone's judgment, and they do in all kinds of ways. They have effects where they hype people up, and they have effects of drowsiness, and they can impair people's judgment. And you don't need me to point out the dangers of widespread loss of life, tragic loss of life, and not to mention the property damage. And then there are years and years of litigation on which the railroad would be on the hook. The railroad would be liable. And you can be sure in those subsequent lawsuits that the claim against the railroad would be that it had violated the standard of care that was set forth in federal law. And that's the point. This railroad is in a sort of between a rock and a hard place. And I can tell you that the claim in the event of an accident was that the railroad failed to exercise due diligence, and the due diligence was in fact set forth by the information necessary in the federal regs. Let's be very clear about this. Mr. Coffey provided the information necessary to satisfy that federal regulation. As far as he's concerned. As far as the only expert in this case is concerned. Right. And that regulation requires a medical subjective component. If you look at the regulation, Your Honor, it talks about the, it's a medical opinion. The only medical opinion in this case is Mr. Coffey turned over more than enough. But look, counsel, you have to look at the reasonableness of this. As I understand it, this particular plaintiff had been involved in an accident before and had tested positive for several drugs which were not codeine, and I forget what the other, but they were not permissible drugs. So we are... They are permissible drugs. No, excuse me, counsel. We're talking about someone that has a problematic history here. And that person, hold on. He does not have a problematic history. The fact that there was a derailment, that was not his fault. But that's neither here nor there because he provided the medical records necessary to show that he could legitimately work with these medications. He was fired for not turning over records that didn't even exist. It is fundamentally unfair to ask an employee, hey, give us your medical records, but not do it from the medical director, not even do it from the nurse who decided which records to get, but have a caseworker who does not communicate with him effectively. He goes to the doctor time and time again and gets those records, sends it to the employer, and they then fire him for not producing records that don't even exist. So has he made an affidavit that they don't exist? That's in his testimony. It's also in Dr. Kevin Trangle's testimony that, look, some of these records, for example, there's talk about the medications. All of the records that the hospital says he didn't supply, he says don't exist. See, I read his testimony to say he kept sending the records and the hospital didn't get them. So you tell me what his testimony is. It's both. He sent records time and time again. And he sent records. So he's not saying they don't exist. It depends which records you're talking about, Your Honor. Well, many records that they asked for, he sent. Some of the records he sent and they didn't get. He sent the records that exist. He could not send the ones that don't. For example... But he says he sent some that they didn't get. Not that they didn't exist, but that they didn't get. Is that not correct? We all now agree that they have them eventually. So he says... I beg your pardon? We all agree they got them eventually. He says he sent them repeatedly. Right. He says so he didn't say they didn't exist. He didn't say those records that he sent didn't exist. He said they existed, but the railroad says it didn't get them. That's true. So that isn't a claim by him that they don't exist. It's that he didn't get them to the... He agrees he didn't get them to the railroad. We all agree the railroad eventually got the records. So what happens is the railroad requests a list of records. Record A, record B, record C, record D. Mr. Coffey goes and brings the letter saying this is what they want. The doctor, and this happens repeatedly, faxes them over. The railroad says we didn't get them. He goes back and does it again. Some of the records on that list don't exist. What's an example of something that doesn't exist? So three years worth of his prescription medications, he hadn't been taking it for three years. And so it simply doesn't exist. So instead he sent two and a half years worth? Yeah, so he sent what he had. And he said I haven't been taking them for three years. I only have two and a half years. Yes. So that's a record that doesn't exist. To which the railroad responded by saying... So this is Teresa Mack, the case coordinator. She is not the nurse who decided which records to request. She is not the medical director. Teresa Mack told him, I don't care this is what we're requesting. I'm not going to argue with you about this. You need to get it to us. This is the two and a half to three years thing. We can find this somewhere in the record. Yes, and during what Councilor Auger and I can look up and point to. But that's not why he was fired. I thought you were making a different point which was that, and I may have misunderstood this, that sometimes they would ask for things like, you know, side effects and the doctor just wouldn't say anything because there were no side effects. And that you, but that's not what you're talking about. You're only talking about records that don't exist. Is that right? Or records they're not entitled to. Part of the issue is, and I'm not trying to be confusing to the Court. I don't know what it is Norfolk Southern wants. As I stand here today, I don't know what record they want that exists. Norfolk Southern... Well, you're in charge of that information. You, they don't have the information. You have the information. If the information that they're entitled to do, to receive, is going to get to them, you are in possession of it. They don't have it. That's right. And they're just trying to get it. And what bothers me about this is we were, the district judge in this case handled this case very conscientiously. It's a fine district judge. But if we reverse on this kind of thing, it seems to me we run the risk of not giving a wide berth to public safety. Because one of the canards that goes around here is, oh, we have technology and we have all these advanced technical systems, which reduce our reliance on airplane pilots and locomotive engineers. And that's not true. These trains, they go lickety split sometimes, but then they have to vary their speeds for all kinds of reasons. They have to slow down in some instances. They have to have good judgment in whether the train starts going before all passengers are aboard or not. There are things on the tracks that aren't cleared right away. And you've got to have the kind of instincts to slow the engine down when an animal might be crossing the track or a car might be crossing the track or a limb is across the track. And when you ride a train and look down, sometimes they're good shoulders and sometimes you're going over an overpass or a bridge or there's a steep plummet and a steep drop. And you just can't afford to have locomotive engineers that are operating at anything less than full mental capacity. So I'd like to reserve my time for rebuttal, but I'd first like to answer that question, Judge Scott. Because we agree, no one is saying Norfolk Southern could not ask for his medical records. What we're saying is you could not ask for as many records as you did, the way you did. And the only expert testimony in this case is Mr. Coffey provided more than enough information to demonstrate that he could safely do his job. Any other records Norfolk Southern wanted were unreasonable. That is the only expert testimony in this case. Okay, can I ask you a couple of questions about what was and was not presented? Did he present records talking about the use of the drugs at the dosage prescribed? Yes. Okay, and if he didn't, they did ask for that and that would be legitimate, right? And those records would exist, surely? Yes. Okay, so your answer is yes. Yes. And it wasn't this great big bundle at the end. It was earlier than that, right? I'm sorry, I'm not sure I understand that question. I understand at the end, he dropped a whole bunch of records. So there's a dispute of fact about this. He says, I've been sending you these records all along. I've been going to my doctor, asking them to release these records. They fax it to you. You keep giving me different fax numbers. You keep having me talk to different people. But before his termination, he shows up at his hearing and he produces all of those records in person. And so there's a dispute about when they got them, but we know by the time they have the termination, they have all those records. And you don't know which are which. You don't know when just came in at the hearing. So I know what Norfolk Southern says is the case. Part of the problem... Why don't you know? I mean, this is your client. They were your records. I don't know how I would prove Norfolk Southern received a fax. No, you would know what came in at the hearing. Oh, at the hearing, yes. Yeah, we know what all the records that came at the hearing, we know what they have. Yes. I'm sorry, and those records did include records about that he was taking the codeine at some particular interval consistent with the doctor's. Yes, and why he was taking that had nothing to do... that he wouldn't be taking at work. It's for a skin infection on his back. That would no impair his ability to work. All right. Thank you very much. Judge Motz, Judge Harris, do either one of you all have any further questions? Mr. Thompson? I think we should talk for a minute about the Achilles tendon situation because it's somewhat different. And we have no other argument this afternoon or this morning, Judge Wilkinson. Certainly. So for the Achilles tendon, the testimony in this case by the only expert is once they got the return to work note from the doctor as well as the FCE examination, so the functional capacity examination results, it was clear he could work and there was no need for further medical documentation. But I thought the capacity function report said he had trouble with stairs and he has the calf issues. Why isn't... if he's having trouble with stairs, why aren't... and climbing stairs is part of the job, why aren't they entitled to follow up on that? There was nothing to believe in there. He couldn't climb stairs. But what did it say? That he had difficulty with stairs? And his foot was extruded or intruded or something like that? My reflection was stiffness, but it well could have been difficulty, but there was nothing to indicate he could not do it. As the only expert in this case said, the proof's in the pudding. He was returned to work by his doctor, the functional capacity examination said he passed whether he had difficulty or not, he passed. But the proof in the pudding is if you put somebody that can't do the stairs fast enough and they need to for the safety of the people in the train, the pudding's not going to be good. I just don't, I mean, I do think safety concerns have to outweigh concerns, individual concerns about when you would like to return to work. Your Honor, we agree completely, but we also think those decisions need to be made by medical experts. And here, the medical testimony is he could safely do his job. And let's be very clear, there is not an expert opinion to the contrary. Even their medical director says she never made a determination whether he provided enough records to safely do his job. I, so, I'm sorry. So he has difficulty negotiating stairs and he's limited by calf weakness. But your position is that upon receiving that information, the company has no choice but to say he's good to go. It's not a matter of my opinion. The only medical expert says after the FCE, it was clear he could do his job after being released to return to work by his treating physician. And after the FCE- But the treating physician, does the treating physician have job, you know, a description of what the job demands are from the company? Like, how is the treating physician who says he can't walk, he has difficulty negotiating stairs, how is he in a position to put together whether that difficulty is going to be a problem on the job? So this goes back to your Honor's original question, which is a procedural problem with how Norfolk is going to handle this. In one of the notes from the doctor, the doctor said, if you have any questions, call me. That's what should have happened. Norfolk's other medical directors should have talked to the patient or the employee, Michael Coffey, and if there was any concern, should have called the doctors. Don't you understand, you know you're a lawyer, often you want something in writing rather than to hear it or to hear it because recollections change on what was said. But when something is in writing, there it is. We can agree. Sure. So there would be a very good reason while the railroad is worried about safety that it would want a response in writing. Sure, but you don't put the onus on the employee who is not a medical expert to do that. And so if you want it in writing, you call a doctor and say, hey, we're sending you this job description, this form, you know, this is how it's typically done. I mean, I understand what you're saying. It does seem like this was a quite onerous kind of document production they were putting Mr. Coffey to here. And I do understand that it can be difficult to deal with the medical establishment. I have two concerns I guess I would invite you to address. One is that I can understand though why an employer might think it is more protective of an employee's privacy not to be calling around to their doctors. And the other is I don't see anything in the statute that goes to the process by which information is collected. As you explain, like this provision is about protecting privacy. It's a limit on what employers can ask for and find out, but I don't see anything in it that goes to the process. Once you've established that there's no privacy right being violated with respect to the reasonableness of the information being sought, I just don't see anything in here that talks about the process by which it's gathered. And I agree there's nothing in the statute, but what there is is a reasonableness component. But the reasonableness seems to go to the reasonableness of the need for the information, not the reasonableness of the method by which it is collected. It's difficult to divorce those two things because what you do as a medical director or as a doctor is you talk with a person to determine what information do I need. Not talking with the employee, not talking with the doctors makes it impossible to determine what you actually need to obtain in order to make a determination. And that's really the problem here is neither the nurse, neither the medical director talked with the employee, talked with the doctors. They left it to, you know, a third-hand person. So three people removed without making the proper medical judgment, having the proper... But you're making these categorical, these conclusory statements that, oh, we provided everything that was asked for, the records exist, and we provided them and all the like, and the railroad will undoubtedly come and say, no, we haven't provided, you haven't provided them, we haven't gotten near enough. And that's why the only neutral party in this whole business where you just have these conclusory, a clash of conclusory statements and to some extent is a district judge. And I just don't understand why this presents anything more than a classic discovery dispute, which can also present questions of privacy. But would you mind doing this, taking some of this up on rebuttal? Because you did reserve some time. Sure, Your Honor. May I answer that one sentence first, please, though? This is not my conclusory sentence. Those are the only expert in this case's conclusions, not mine. Well, I know the Second Circuit says bringing on an expert doesn't necessarily create an issue of triable fact, but that's, you can go over that on rebuttal if you want. All right, is it Mr. Spain? It is, Your Honor. Good morning. Please, the Court, my name is Brett Spain and I'm here on behalf of the appellee, Norfolk Southern. I'll admit I had prepared a slightly different argument than the way this has gone because in my view, they were both procedural and substantive issues that needed to be addressed here as far as the standard. The, and as we pointed out, the district court did a full rebuttal. You're in control of your arguments. Certainly, Your Honor, and I had anticipated some discussion of the McDonnell-Douglas standard in the opening argument and there was none. I don't want to overlook that because I do think that it was important. That's what the lower court did to announce on McDonnell-Douglas and did the analysis that the court has looked at today on the medical inquiry standard. It did both of them and the plaintiff has only appealed the latter of it and under accepted appellate procedures, he has to present each argument, each independent grounds on which the court relied in order to prevail. I don't understand your argument on this. It looked to me like the district court thought, rightly or wrongly, that the plaintiff was bringing two different claims, a standalone medical inquiry claim and also a more sort of general disability discrimination claim ruled against him on both and he's appealing one. Why isn't that fine? I don't think that's exactly what occurred there. The plaintiff in his motion for summary judgment opposition specifically said that the McDonnell-Douglas standard does not apply to any of the claims. That's why I think I'm not 100 percent sure that the district court was right that there were two separate claims in front of it. But nevertheless, the district court went ahead and adjudicated two grounds, said he can't prevail on either and he would like us to review the holding that he can't prevail on the medical inquiry claim and that seems fine. Well, I think that's what happened is that he said that the McDonnell-Douglas standard doesn't apply to either of them. The court said, you're wrong, but I'm going to go ahead and do the analysis of the medical inquiry claim as part of the prima facie case. Is it job related? Consistent with business necessity and then also did the McDonnell-Douglas part of it, which we think is appropriate. That was express holding of the trial court, which has not been appealed and is an independent ground to affirm it. Well, in case we don't think that that gives you the whole game, maybe you could address what was said. Like I said, I'm here to prepare to do both. You know, the reason why I think that the plaintiff has changed course here and focusing just on this medical inquiry and that standard is because he knows there's not a shred of evidence that Norfolk discriminated against him on the basis of disability. Well, let me tell you, I mean, I don't think he's bringing that claim. I think he is limited, at least now, we are only talking about a medical inquiry claim. But this is, I'll just tell you my concern about this case. It sure does look like this was an amazingly onerous process that was imposed on this employee. It is hard to get information out of doctors. It would have been a lot more straightforward for the employer if it had some residual questions after 400 pages of medical records were produced just to go directly to the doctors, to give the employee, maybe Mr. Coffey, a form that had the questions that the employer wanted answers to, to hand to the doctors. Like this was not handled in a particularly efficient way, which is how you can end up with 400 pages that don't answer the question. And so I guess my sort of free-floating concern about this kind of case is that if an employer did say want to not bring back an employee because he had a bad ankle, um, it wouldn't be that hard to say we'd like to bring you back, but we're going to need 10,000 pages of records, and then we're going to, like, flyspeck them to make sure we have everything, and then we're going to go back and ask you for more and more and more, and use that as a pretext not to bring someone back. So that's sort of my concern about what happens if we don't put any check on the method by which employers can get this information. Your Honor, I understand your concern, and I think there's a legal question that Your Honor raised earlier in the opening argument, whether there's a legal duty or anything in the law that says this is how you have to do it, and the Court is right, there isn't. But getting to your more practical question of should there be, or should there be something that, that, you know, a process. Of course, Congress can say that there is, but in this case, what we're talking about is a specific list of requests. There were letters that were sent out in April of 2016, July of 2016, saying these are the specific records that we need. That's what, and he was instructed, if you have a problem, take this to your doctor, show them what the list is, and get these, these records. It was not overbroad. It was not unclear what the records were. It was, here are the information that we need. And if you look at the letter, the requested records, for example, on the Adderall and in coding, each of those requests are specifically tailored to meet the federal regulations that the railroad has to comply with in order to make sure that they're not putting an employee who is not at full mental capacity behind the engine of a train, for all the reasons that Judge Wilkinson identified, that this is a very serious matter. And this is one thing that the parties don't dispute. Locomotive engineers, one of the most safety sensitive positions that there is, if there is a derailment, you're going to have loss of life, property damage, environmental disasters. This is something that the railroad should not try to be, take a risk that it's not, it's going to put somebody who is not safe to return to work because he might face the claim that it is asked an overbroad request. And so what it did is it prepared these letters and said, here they are. Gave them to him April, gave them to him July. Take these to your doctor. This is what we need to get you return. And the undisputed evidence here is those were just ignored. It wasn't until the summer of 2017, a year after the first request, that the plaintiff even produced a single document. And then it was, as the court is asked about the records and what was produced, there was only 35 pages that the plaintiff could in any way prove had been sent or received by Norfolk Southern. His records matched Norfolk Southern's records on that. What he said he could document was sent exactly what Norfolk Southern said it received, 35 pages. It was when he showed up at his disciplinary hearing with the 403 pages that he came with those records. And even then, the railroad gave him the benefit of the doubt. Looked through the records to see, all right, does this contain at least the minimal information that we need to return you safely to work? And it was only after it was determined that he did not do that, that they terminated it. And that wasn't even the last step, though. I guess if you did, counsel, I guess if you just wanted to get rid of someone or dismiss someone, you wouldn't go to all the trouble that you went here to trying to... The way I read the record, I looked over a lot of it, is that they were just trying to... They hadn't made a decision. They were trying to get information on which to base the decision. Exactly. That's exactly right. And they're not going into it trying to terminate him. They're trying to see when is he safe to return to work? And it's a year passes that he ignores the first request. He gets to... He's completely ignored the Achilles request. We actually need to... You say you want to come back. We actually need this information to determine whether it is safe for you to return. It's not... So was he working during this time? He worked for a little bit at the beginning, but when he went on the Achilles, he was not working. He was out. Well, how far along was that after the original inquiry? I think he toured on June 10th. So... I'm sorry. The first request was April 25th, 2016, but he had a... He was permitted to continue working because he had prescription at that time for the... And so it was verified negative. He was allowed to continue working, but Norfolk Southern had to ask the questions that it did. But from June 10th, I believe on until... Well, he never came back. He was out of work. And so at that point, saying, all right, we were serious. You have to... You know, we can... We have a little leeway on this stuff because you have a prescription, but we have to determine whether you're using it correctly. And as I heard Mr. Thompson say, well, yes, he had that information in the records. Where? He still hasn't pointed out. I didn't point out his brief. This is the part of the joint appendix where you're going to find where I provided all that information that the plaintiff did. It's not there. We included the letters in our brief, the actual letters from his doctors on the two prescriptions because we wanted the court to see what exactly... What information did he provide and what information did he not provide? And in one of the cases, it didn't even say what the condition was that he was being treated for. Neither of them talked about the dosage, what the dosage would be, whether he was actually observing it and the side effects. What are the side effects? What are the... Generally, what are the side effects that he's experiencing? How long are they being experienced? Can I ask you just a quick question? Why would the doctors know whether he's observing the dosage amounts? Is the idea that if he's not, like they would know he'd have to refill prescriptions more often? I mean, wouldn't it be easier just to ask him? You could ask him and to some extent you would... You're relying on the plaintiff being truthful in his self-reporting, right? And it could be to the doctor, it could be to... How would the doctor know? The doctor certainly can't say, I can swear that this is all he's doing because I'm not in his house every day observing him doing that. But the doctor would at least, you know, before this issue would come up, there would be a history there of, you know, all right, here's what I prescribed. When did he come back for more medicine? When did it need to be refilled? Is he doing it on the schedule that he's doing? Is he doing it too much? Does he come and when he presents to me, say, oh, I need more. Does it sound like he has a problem with it? The specific question to the doctor is, is the person adhering to the schedule? Right. And the doctor can give, you know, is this the doctor that is seeing him for this condition could give at least his or her opinion on whether that's being followed and whether it's working. You could say, I don't know, but it would also... What if the doctor said, I don't know, would that be satisfactory? Then what would the employer do? It's hard to say because the regulations, you can't opt out of them, right? The Congress has said, this is what the railroad has to consider. And if it can't get, if it doesn't have the information to consider those issues, it cannot allow a locomotive engineer to be a locomotive engineer. And so you're in a very difficult situation, but certainly you go to the first, you know, go to the doctor who's treating him and say, this is what we need to know. And we put those letters in our brief because they do not contain close to the information that's required. And where else would they go if the doctor didn't? I mean, the doctor's got to be the best source, but it may well be, for the reasons my colleagues mentioned, it may well be an imperfect source, but it's the best source. I don't know, where else would you go if you don't go to the doctor? I mean, where else would you satisfy the obligations set forth in federal law? I agree, Your Honor, and the plaintiff's position is, well, I have an expert who's going to tell you what the law is, and according to this expert, all you have to do is talk to the employee. And you have to presumably accept whatever the employee says. And if the employee says, no, I'm good, here's my prescription, here's when I use it, you're not allowed to ask any further. Wouldn't it be better if you, I mean, I have read the record in this case, and it's, I do understand everything you're saying. Is there some reason you don't just give the doctor a form that says, you know, like with boxes, like, is there any indication that this patient is not using it? Because I could see, if I got this form as a doctor, like, I don't know whether he's using it as prescribed or not. And I would just leave the question blank, and then the person would get fired. But if I got a form that said, is there any indication he's not using the medication as prescribed? Is he refilling prescriptions more often than he should? Then I would check the boxes. Right. Your Honor, I don't know all the practical difficulties that would go along with that. But certainly, a form presumes that one size could fit all for all these kinds of inquiries, that you could have a form versus letting the doctor explain to you as the employer what the condition is, what the specific circumstances are, where you would want more than a box that's been checked. You'd want an explanation of what is the condition, how serious is the condition. And the next thing you know is we gave a form, and somebody says, well, your form was deficient. You didn't ask the right questions, and you let this person come back to work because you didn't ask the right questions. And as the Court has observed, between a rock and a hard place here, this is an extremely important position that the plaintiff held as far as safety is concerned. The federal regulations put the burden on the railroad specifically, not just a general employment requirement, on the railroad to find this information out. It was not provided, period. And that's why he was terminated. Okay. Can we talk a minute about the Achilles tendon? Yes, Your Honor. Do you have an argument? Certainly. The same thing. He was out in June and then advised of the railroad medical department in July. They sent out the request for information. Now, as the Court has observed, the standard for whether it's job-related and consistent with business necessity is whether the employer has enough information that a reasonable person would question whether the employee could safely perform his duties.  that he couldn't perform his duties. He said, I'm out. I've torn my Achilles tendon. I cannot perform my duties. I am out. And he left. He didn't come back. It was the following year when he said, okay, I think I'm ready to come back when all the further round of letters came back. But certainly, the law is clear that when an employee is out for an extended period that the employer is allowed to make reasonable inquiry. And under these circumstances where he has told Norfolk Southern, I can't work with this condition. Given the duties that I, you know, I'm not sitting at a desk. I can't go on crutches and get to my job and do it. I can't do my job because of my injury. The railroad certainly is entitled to then say, all right, we need to know more about this to make sure that you actually can, that you have healed to the extent. And he gave you more. Right. And so they say, here's the records that we need. And what the plaintiff has come back and said, well, I went to my regular doctor. He gave me a right to return to work letter, a two-sentence letter. The law is clear. That's not sufficient. That the employer is allowed to make its own inquiry and doesn't have to rely on a return to work letter. Well, didn't he do the... The FC, yes. That was the next one. The other thing he pointed to is my functional capacity evaluation that was undertaken. And there isn't anything in the record that indicates that the person who did that evaluation was aware of his duties and all that it entailed. But ultimately, this comes down to a judgment call on your part. And the railroad is the one that's making the judgment. And I think you're entitled just not to infinite latitude, but I think you're entitled to some latitude in making a judgment because you are the one who has been charged by federal law with maintaining the safe operations of the trains. And so I think you're entitled to not unlimited latitude, but I think you're entitled to substantial latitude where this kind of value is concerned. And the conundrum rises, the more information you get, the better judgment you can make. And that faces resistance because the more information you want, the more someone is likely to resist on the grounds that these are personal medical records. And it's a dilemma, but I don't see any way around it because the truth of the matter is you need more information rather than less in order to make an informed judgment and not a judgment that just at bottom is a complete leap of faith. So that's, you know, you need comprehensive information and at the same time, you run into resistance on that very point. But I don't see any way around it. Your Honor, I think you're exactly correct that this is something that you have to have latitude in what can be requested. You have to have some substantial reasonableness in considering what you've gotten back and to see whether he's qualified. And the functional capacity evaluation that the court was asking about, it did not give him a clean bill of health. It specifically said he had difficulty with even regular stares and that he had calf weakness. And he doesn't dispute that an essential part of his job is getting off and on the train multiple times a day, walking over uneven boughs. He's got to be able to do that. And that's a good example. So what we also have is, and he keeps talking about, is his expert. Right. Who is the only doctor's testimony that we have. Certainly. And that's, this is all you need. Your Honor, I know that that's all he has. And... No, he has his own ability, he says. And he has this functional capacity kit. No, no, I understand that. What I meant was that's the only evidence, so that's the only legal authority that he has. But you don't have an expert. No, we don't have an expert, but... Then what we are stating is one expert. So does that create an issue of material fact? It does not, Your Honor. What the expert is trying to do is tell the court what the law is. And this is, once you have this, the law doesn't allow you to do any more than that. Everything that he's talked about is exactly that analysis. But once you have this, the law doesn't allow you to ask for more than that. The trial court examined this exactly correctly. What the trial court said is, I've looked at that evaluation. It says he still has trouble climbing stairs. It says that he still has calf weakness. It was reasonable under those circumstances for Norfolk Southern to continue asking for records to make sure that he could do that. That's the analysis. What does the law allow the employer to do? What the plaintiff has offered to this expert is what his personal steps are. This is what he thinks should be done. This is what he would have done. This is what he did when he was in practice and not a hired expert. And that's not what the law says. As the court has already pointed out, there is no procedure that's mandated by the statutes. There are no steps that are mandated. There's nothing in the law that says you have to talk to the employee at the beginning, at the end. There's nothing that says that the employer has to go directly to the doctors. And there's a lot of good reasons why you wouldn't want employers going directly to doctors. As Judge Harris pointed out, this is a statute that's concerned with privacy. And to impose liability because the employer here didn't go and then start having direct conversations with the medical professional is hard to accept. And I don't think it is required by the law. I think the trial court judge got this exactly right. The trial judge considered every argument that the plaintiff raised, specifically analyzed whether he had produced records that were required to be produced in order to return to work. We found that he had not. But there's not a factual dispute here. We think this is a straightforward case. And I would ask the court to affirm on that basis. JUDGE LEBEN All right. Thank you very much, Mr. Spain. Hold on, Judge Motz. Judge Harris, would you like to ask further questions of Mr. Spain? JUDGE HARRIS No, thanks. JUDGE SPAIN Mr. Thompson, you have rebuttal time. MR. THOMPSON Thank you, Judge. So let's work in reverse order because I think two of the conditions are easy to knock out. Let's start with the FCE. Judge Harris, you asked me about that. Let's be very clear about this. This is not just a case of one expert having said that Mr. Coffey could safely do his job. Both of Mr. Coffey's treating physicians did as well. Concerning the FCE, Dr. Payne reviewed the FCE results and re-examined Mr. Coffey on 4-18-2017, at which time she opined he was ready to return to work. She officially released him to full duty with no restrictions, limitations, or required accommodations of that date. She provided no prescription refills for Norco or any other medication related to his Achilles tendon injury and surgery. In other words, the only doctor that examined him after the FCE said, you're good to go. Norfolk Southern's doctor didn't even bother to talk to him. Let's move on to the next condition, the ADD. I don't think anyone here is really taking issue with him taking ADD medication. In fact, that helps him better do his job. And their own medical expert, again, who never talked to Mr. Coffey, admitted she had the prescription. So we're really talking about the pain medication, the Tylenol-3 medication. About that, Dr. Jimenez, another treating physician, this is actually his primary care physician, responded to a request from Norfolk Southern on 7-5-2017, confirming that Mr. Coffey infrequently took Tylenol-3, which she prescribed for flare-ups for a chronic back condition. She and Mr. Coffey had an agreement that he would not take the medication just prior to or during work hours. As with his previous treating physician, she noted no issues regarding misuse, abuse, or diversion of this medication. It is not just Dr. Kevin Trangle, the independent medical expert. It is both of the treating physicians. It is every doctor who has talked to or examined Mr. Coffey has said he can safely do his job, and Norfolk Southern had no reason to believe otherwise. Now, can Norfolk Southern inquire? Certainly it can. And let's look at the circumstances under which it can require. That's governed by 49 CFR 219.103. And what it says is a physician designated by the railroad has made, quote, a good faith judgment, end quote, and it continues on, that the employee can safely do his job. So the employer has to make a good faith judgment. And to the court's question, well, what constitutes a good faith judgment for a doctor? That is an expert question. I can't determine what's a good faith investigation by a doctor because I'm not a doctor. That takes a doctor to determine. The doctor in this case, the only expert in this case, said that what Norfolk Southern was not in good faith. It was not a good faith judgment. They were asking for records they did not need because Mr. Coffey provided every reasonable record. And that is not Kevin Trangle's, just his personal steps that he took. Rather, he talks about a standard of care in that community, that this is what doctors in that community do. And so the only testimony in this case, that the standard of care is to talk with the employee and then based on what the employee says, talk with the physician. Here, Norfolk Southern's doctor didn't talk to anybody. Norfolk Southern's nurse didn't talk to anybody. The only thing that happened is they had a frontline clerical person talk to Mr. Coffey and say he needed to get certain records. When you're talking about expert testimony, are you familiar with Bay v. City of New York, which is a Second Circuit case that came down just this year? I'm not, Your Honor. Well, it dealt with the question of expert testimony as it relates to federal litigation and to federal regulation. And they go on at some length and indicate that expert testimony, the Second Circuit squarely rejected the proposition that expert testimony could create an issue of tribal fact where a requested accommodation or requested request as here was permitted or was authorized, indeed required by federal regulations. In other words, I don't think just bringing on an expert, and the Second Circuit is really clear about this, where the federal regulations are clear, bringing on an expert does not create an issue of tribal fact in and of itself. And I'm by no means arguing that just because we have an expert, that creates a tribal fact in every case. What I am saying is when what's at issue is whether a doctor has made a good faith judgment as to whether an employee can return to work, that is an expert question. Can I ask you a question about the interest? So you're talking right now about the railroad regulations, right? Yeah, and I do understand that a big part of the defense in this case was we were required to make these inquiries because of the railroad regulation. But is it your position? I mean, I would have thought that there might be inquiries that would be not required under the railroad regulation, but still permitted under the statute. That there would be some space between those two things, that you could have a legitimate work-related, business necessity need for information that you are not required to get. Certainly. Okay. The federal regulations just set the floor. Certainly they can go beyond that. The problem here is that every medical expert, both the treating doctor, the primary care physician, and the independent medical expert, all say these records demonstrate Coffey can safely do his job. You had enough. You didn't need anything else. And the real problem is nothing else really existed. I still don't know what record they wanted. He's been reinstated by a public law board. He hasn't been able to go back to work. We still don't know what record they want. Their medical director still has not talked to him and told him this is what we want. Their medical director still has not called his doctor and said this is what we want. You can't put the onus on a layperson to go out and get medical records they don't understand and then be upset with them and fire them when they don't do a good enough job. There has to be something more than that. All right. Thank you very much. I just have one question that I've been on. Absolutely. So what is the basis of your claim? Are you making a claim for discrimination in firing? It's our position that the impermissible medical inquiry that results in... I understand that claim. That is our claim. Is that the only claim that's before us? It seemed to me in the court, in the district court, you made a number of other claims. We think the district court analyzes a discrimination case. I don't think it is that. I mean, they fired him for not producing the records. I don't know that what was in the record. You say that your only claim is dealing with these records. Is that right? It's an impermissible medical inquiry claim. Yeah. I can't hear you. Yes, it is an impermissible medical inquiry claim. Okay. It seemed like before the EEOC, at least, the claim was slightly different. That all of this business about the records was a pretext for firing someone they wanted to fire because he had a bad ankle. But that is not the claim you're making now. So part of the problem is this theory of liability under the ADA is not well developed. There are not a lot of cases on impermissible medical inquiry. Um, it is our position that if an inquiry is illegal and you fire somebody for not producing a record you weren't entitled to, that falls under impermissible. So your position in front of us, I really am just trying to clarify, this is fine, is that, oh, no, he was fired for not producing these records. And the reason that's illegal under the ADA is because they weren't entitled to the records. Your position is not, no, he was not fired for not producing the records. That's a pretext. He was actually fired because he has a bad ankle and he's old. No, we think he was fired for not producing the records. Thank you. Any further questions? No, thank you. Thank you, Judges. Mr. Thompson, Mr. Spain, we thank you both and appreciate your arguments. And, um, sorry we cannot come down and greet you, but I hope you both have a pleasant afternoon. Thank you, Judge. Thank you, you too. Um, we will, um, um, adjourn court and take a brief recess and then, uh, come back in and conference. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Pamela A. Harris